Gregg A. Hand, Esq. (GH2194)
HAND LAW OFFICES LLC
5410 Edson Lane, Suite 315
Rockville, Maryland 20852
Tel: (301) 250-6590
Fax: (301) 476-4525
E-Mail: ghand@handlegal.com

Attorney for Plaintiff, Menachem M. Bluming



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MENACHEM M. BLUMING<br>11826 Seven Locks Road<br>Potomac, Maryland 20854 | : | |
| | : | JUDGE McMahon |
| Plaintiff, | : | |
| v. | : | Case No. |
| INTELLICELL BIOSCIENCES, INC.<br>460 Park Avenue, 17th Floor<br>New York, New York 10022 | : | **COMPLAINT** |
| Defendant. | : | |

COMES NOW, Plaintiff MENACHEM M. BLUMING, by and through counsel, and for his Complaint for damages against Defendant INTELLICELL BIOSCIENCES, INC., he alleges as follows:

## NATURE OF ACTION AND RELIEF SOUGHT

1. This is an action to recover from the Defendant more than Five Hundred Thousand Dollars ($500,000.00) owed the Plaintiff on a promissory note dated June 3, 2011, together with interest thereon, attorneys' fees and expenses. The maturity date of the note was March 31, 2012, at which time the entire unpaid principal balance plus accrued interest were due.

2.    Plaintiff has demanded payment of the note and declared the note to be in default. Although Defendant has not denied that it owes Plaintiff money under the promissory note, Defendant has failed to pay the Plaintiff all amounts due thereunder.

## THE PARTIES

3.    Plaintiff Menachem M. Bluming ("Bluming") is a Maryland resident who resides at 11826 Seven Locks Road, Potomac, Maryland 20854.

4.    Defendant IntelliCell Biosciences, Inc. ("IntelliCell") is a corporation organized and formed under the laws of the State of Nevada.  Its corporate address and principal office are located at 460 Park Avenue, 17th Floor, New York, New York 10022.  IntelliCell is a regenerative medicine company, focusing on developing technologies and processes in personalized medicine for the regenerative, preventative and curative elements of age-related disease states. IntelliCell is a public company listed on the OTCQB under the symbol "SVFC".

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.    This Court has personal jurisdiction over IntelliCell and venue is appropriate in this judicial district under 28 U.S.C. § 1391 because IntelliCell is a corporation that is deemed to reside in this judicial district.   Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this district. In addition, both parties have agreed to the jurisdiction and venue of this Court in the terms of the promissory note at issue.

## FACTUAL BACKGROUND

7.     As consideration for receiving a bridge loan of $500,000 from Bluming, IntelliCell issued and delivered to Bluming a promissory note styled as "6% Subordinated Convertible Note" dated June 3, 2011 (the "Note"). *See* Exhibit 1. The term of the Note ran from June 3, 2011 to March 31, 2012.

8.     The principal sum owed under the Note was Five Hundred Thousand Dollars ($500,000.00).

9.     The Note bore interest on the unpaid principal balance at the rate of 6% per annum, calculated on the basis of a 360-day year with twelve 30-day months.

10.     The terms of the Note required IntelliCell to pay to Bluming the entire unpaid principal balance of the Note in cash on March 31, 2012, plus accrued interest thereon calculated from June 3, 2011 to March 31, 2012. The accrued interest was to be paid in the form of shares of IntelliCell's common stock, valued at $0.88 per share under the Note.

11.     The terms of the Note, Section 8.2, also provided that if the Note was "placed in the hands of an attorney to institute legal proceedings to recover any amount due hereunder, or to protect the interests of the holder [Bluming] hereof, or in case the same should be placed in the hands of an attorney for collection, compromise, or other action, the Maker [IntelliCell] binds itself to pay all costs of collection and litigation together with the reasonable fees of the attorney who may be employed for that purpose."

12.     Although the Note became due on March 31, 2012, IntelliCell defaulted in the payment to Bluming of the unpaid principal amount of $500,000.00.  IntelliCell also defaulted in

the payment of the accrued interest of 6% as IntelliCell failed to issue shares of common stock to Bluming on or before March 31, 2012.

13.     On May 9, 2012, Bluming verbally requested payment of the Note from IntelliCell's chairman and chief executive officer, Dr. Steven Victor.  Victor told Bluming that he would need to wait 90 days or more to be repaid on the Note.  Victor did not deny that IntelliCell owed the money to Bluming.

14.     On May 11, 2012, Bluming sent an email to IntelliCell's Board of Directors, informing them of his conversation with Victor about having to wait 90 days to be repaid on the Note.  Bluming told IntelliCell's Board of Directors that he was not in a position to wait any additional time for the loan to be repaid and would seek the assistance of legal counsel to obtain repayment if the Note was not repaid by May 18, 2012.

15.     On May 17, 2012, legal counsel for Bluming sent IntelliCell's Board of Directors a certified letter informing the Board that IntelliCell was in default of the Note due to its failure to pay the entire principal balance outstanding on March 31, 2012, along with its failure to pay 6% interest in the form of 28,409 shares of common stock of IntelliCell valued under the Note at $0.88 per share.  Counsel for Bluming demanded from IntelliCell immediate payment of $500,000.00 in principal due under the Note, and delivery of 28,409 shares of common stock. Counsel notified IntelliCell that interest on the unpaid principal balance of $500,000.00 would accrue after March 31, 2012, at the rate of 9% per annum under New York's prejudgment interest rate statute, citing N.Y. C.P.L.P §5001 and §5004, and counsel demanded immediate payment of interest owed.  Counsel also notified IntelliCell that Bluming was enforcing Section 8.2 of the Note and demanded payment of all attorneys' fees incurred in collecting on the Note.

16.     The Note did not set forth a default rate of interest or a default term requiring IntelliCell to pay, and Bluming to accept, interest at the rate of 6% per annum after March 31, 2012, in the form of shares of Common Stock of IntelliCell valued at $0.88 per share.

17.     On May 17, 2012, legal counsel for Bluming informed legal counsel for IntelliCell that if IntelliCell would issue a stock certificate for 28,409 shares of Common Stock, which were due on March 31, 2012, Bluming would waive the Notice of Default for a period of twenty-one (21) days to give IntelliCell additional time to pay all monies owed.

18.     On May 23, 2012, IntelliCell delivered to Bluming a single stock certificate representing 32,479 shares of IntelliCell common stock.   IntelliCell represented to Bluming that the shares of common stock were considered to be payment for the accrued but unpaid 6% interest on the Note for the period June 3, 2011 through May 21, 2012.   IntelliCell issued an extra 4,070 shares of Common Stock, which it calculated were due from April 1, 2012 through on or about May 21, 2012.

19.     On May 23, 2012, legal counsel for Bluming waived the Notice of Default dated May 17, 2012, but only for a period of twenty-one (21) days to give IntelliCell additional time to pay all amounts due under the Note.

20.     On July 18, 2012, after the 21-days waiver of the Notice of Default had lapsed, legal counsel for Bluming wrote to legal counsel for IntelliCell and renewed Bluming's demand for payment of $500,000.00 in principal, prejudgment interest at the rate of 9% under New York law from April 1, 2012 until paid, and attorneys' fees.

21.     IntelliCell has failed to make any payments to Bluming on the unpaid principal amount of the Note or any additional accrued but unpaid interest on the Note.

## COUNT 1
## (Breach of Contract)

22.     Bluming incorporates by reference paragraphs 1 through 21 above.

23.     As consideration for receiving a bridge loan from Bluming in the amount of $500,000.00, IntelliCell issued the Note dated June 3, 2011 to Bluming.  In fact, Bluming had transferred the proceeds of the loan to IntelliCell on or before May 31, 2011.  Under the terms of the Note, IntelliCell agreed to repay Bluming the sum of $500,000.00, with accrued interest at the rate of 6% per annum by March 31, 2012.

24.     At all times relevant, Bluming has performed his obligations under the terms of the Note.

25.     On March 31, 2012, IntelliCell failed to pay Bluming the sum of $500,000.00, together with accrued interest at the rate of 6% per annum pursuant to the terms of the Note.

26.     On May 17, 2012, Bluming, through legal counsel, sent a Notice of Default to IntelliCell.

27.     On May 23, 2012, IntelliCell purported to pay Bluming the 6% accrued interest on the Note by issuing a stock certificate to Bluming representing 32,479 shares of common stock.  IntelliCell claimed that the share certificate represented interest owed from June 3, 2011 through March 31, 2012, and for April 1, 2012 through May 21, 2012.

28.     Interest on the unpaid principal balance of $500,000.00 after March 31, 2012, accrues at the rate of 9% per annum under New York's prejudgment interest rate statute. *See* N.Y. C.P.L.P §5001 and §5004.

29.     IntelliCell has breached the Note agreement by failing to repay $500,000.00 in principal to Bluming and by failing to pay Bluming all accrued interest under the Note.

30.     IntelliCell has breached the Note agreement by failing to pay Bluming all attorneys' fees which he incurred, and continues to incur, in endeavoring to collect on the Note.

31.     As a result of IntelliCell's breach of the Note, Bluming has suffered financial damages.

32.     As a result of IntelliCell's breach of the Note, IntelliCell is liable to Bluming for the damages he has incurred in an amount not less than $680,000 for the unpaid principal balance outstanding, interest, attorneys' fees and expenses.

### COUNT 2
### (Debt Owed)

33.     Bluming incorporates by reference paragraphs 1 through 32 above.

34.     On or before May 31, 2011, Bluming loaned $500,000.00 to IntelliCell, which IntelliCell promised to repay in full on or before March 31, 2012, together with 6% interest per annum calculated on the basis of a 360-day year with twelve 30-day months.

35.     IntelliCell promised to pay the interest which accrued from June 3, 2011 through March 31, 2012, in the form of shares of IntelliCell's common stock valued at $0.88 per share.

36.     After Bluming declared IntelliCell to be in default of its loan obligation, IntelliCell paid Bluming the interest which had accrued from June 3, 2011 through March 31, 2012, by delivering a stock certificate to Bluming for shares of IntelliCell common stock valued at $0.88 per share.

37.     However, IntelliCell has failed to repay Bluming the $500,000 which he loaned to IntelliCell.

38.     IntelliCell is indebted to Bluming in the amount of $500,000.

39.     IntelliCell is indebted to Bluming for interest on the $500,000 loan from April 1, 2012, until paid, calculated on the basis of New York's prejudgment interest rate statute. *See* N.Y. C.P.L.P §5001 and §5004.

40.     As a result of IntelliCell's failure to pay the debt owed, IntelliCell is liable to Bluming for the full amount of the debt and damages he has incurred in an amount not less than $680,000 representing the $500,000 of debt owed to Bluming, plus interest, attorneys' fees and expenses.

<div align="center">

**COUNT 3**
**(Unjust Enrichment)**

</div>

41.     Bluming incorporates by reference paragraphs 1 through 40 above, as if fully set forth herein.

42.     In late May 2011, IntelliCell obtained $500,000 from Bluming which it intended to use for general corporate purposes.  IntelliCell obtained the money on the basis of promises and representations made to Bluming to repay him within a time certain.

43.     IntelliCell received and retained the benefit of the money loaned by Bluming.

44.     IntelliCell knew that Bluming had conferred a benefit upon IntelliCell and knew that Bluming expected to be repaid the principal sum loaned and interest within a time certain.

45.     IntelliCell has benefitted substantially from the monies it obtained from Bluming.

46.     IntelliCell was enriched at the expense of Bluming.

47.     The circumstances are such that equity and good conscience require IntelliCell to pay restitution to Bluming.  It would be unjust and inequitable to allow IntelliCell to retain the benefits of the money provided by Bluming.

48.     IntelliCell's retention of the benefits of the money loaned by Bluming without repayment has caused and continues to cause significant financial injury to Bluming.

49.     Bluming demands judgment against IntelliCell in an amount not less than $680,000, representing the principal sum of $500,000 obtained by IntelliCell, interest, attorneys' fees and expenses.

WHEREFORE, Plaintiff Menachem M. Bluming requests the Court to enter judgment in his favor and against Defendant IntelliCell Biosciences, Inc. in an amount not less than Six Hundred Eighty Thousand Dollars ($680,000.00) as compensatory damages for monies loaned to IntelliCell, prejudgment interest, attorneys' fees and expenses, costs, and/or such other amount as proffered by Bluming in the course of this case.

DATED: February 13, 2013

Respectfully submitted,

Gregg A. Hand (Fed Bar No. GH2194)
HAND LAW OFFICES LLC
5410 Edson Lane, Suite 315
Rockville, Maryland 20852
Tel: (301) 250-6590
Fax: (301) 476-4525
E-Mail: ghand@handlegal.com
Admitted in NY, DC and MD

Daniel A. Ball
BALL LAW OFFICES, P.C.
5410 Edson Lane, Suite 315
Rockville, Maryland 20852
Tel: (301) 770-3050
Fax: (301) 770-3017

E-Mail: dball@dablaw.com
Admitted in MD, DC and VA

Counsel for Plaintiff
MENACHEM M. BLUMING

EXHIBIT 1

THIS CONVERTIBLE NOTE AND THE COMMON STOCK ISSUABLE UPON CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") NOR UNDER ANY STATE SECURITIES LAW AND MAY NOT BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNTIL (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY RECEIVES AN OPINION OF COUNSEL TO THE COMPANY OR OTHER COUNSEL TO THE HOLDER OF SUCH NOTE WHICH OTHER COUNSEL IS SATISFACTORY TO THE COMPANY THAT SUCH NOTE AND/OR COMMON STOCK MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## 6% SUBORDINATED CONVERTIBLE NOTE

| $500,000 Principal Amount | June 3, 2011 |
|---|---|
| New York, New York | |

**FOR VALUE RECEIVED, IntelliCell Biosciences, Inc.,** a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada (**"Maker" or "Company"**), with its principal offices located at 30 East 76th Street, New York, NY 10021 hereby promises to pay to Mendel Bluming (**"Lender"** or **"Holder"**) having a mailing address at 11826 Seven Locks Rd., Potomac, MD 20854, the principal sum of FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000) (the "**Note**"), in lawful money of the United States, together with all accrued interest thereon, as more fully set forth herein.

**1.     Payment of Interest and Principal**.

**1.1     Payment Generally.** This Note shall bear interest on the unpaid principal balance at the rate of 6% per annum (computed on the basis of a 360-day year of twelve 30-day months) payable in arrears, at the Maturity Date, or upon conversion, whichever first occurs. The entire unpaid principal balance of the Note plus accrued interest thereon shall be due and payable on March 31, 2012 (the "**Maturity Date**"). Payment of the principal on this Note shall be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts. Payment of interest shall be made in the form of shares of the Company's common stock, par value $0.001 per share (the "**Common Stock**") valued at $0.88 per share. All payments shall be made at the office of the Lender at the address above, or at such other address designated by the Lender.

**1.2     Voluntary Prepayment.** The Maker shall have the right to prepay the outstanding principal and accrued interest on this Note, without penalty or premium, provided however that the Holder shall have the right, 15 days following notice of prepayment, at its

option to elect to accept prepayment, convert the Note into Common Stock pursuant to Section 6.1 or convert in part and accept prepayment in part.

**1.3     Mandatory Prepayment.** If prior to the Maturity Date, the Company has raised at least $1,000,000 of net proceeds from the sale of equity in one or more offerings (the **"Offering Net Proceeds"**), the Company shall offer by written notice to the Holder the election to receive prepayment of outstanding principal under the Note. If such election is exercised by the Holder within five (5) business days of receipt of such notice, the Company shall promptly pay *pro rata* to the Holder and other holders of similar subordinated convertible notes of the Company (the **"Notes"**) that exercised his/her/its mandatory prepayment elections, in the aggregate amount raised by the Company in excess of such Offering Net Proceeds.

## 2.     SUBORDINATION.

**2.1     Subordination to Senior Debt.** The Maker, for itself, its successors and assigns, covenants and agrees, and the Payee and each successive Holder by acceptance of this Note, likewise covenants and agrees that the payment of the principal of and interest on this Note is subordinated in right of payment to the payment of all existing and future Senior Debt (as herein after defined) of the Maker. "Senior Debt" means the principal of, premium, if any, and accrued and unpaid interest on Indebtedness (as herein after defined) of the Maker, whether outstanding on the date of issuance of this Note or thereafter created, incurred or assumed, unless, in the agreement or instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such Indebtedness is not superior in right of payment to this Note *provided, however,* that "Senior Debt" shall not to be deemed to include any Indebtedness of the Maker to any of its subsidiaries or affiliates (as such terms are defined in Rule 405 under the Act).

**2.2     Indebtedness.** "Indebtedness" means (a) any liability of the Maker (i) for borrowed money, or (ii) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), given in connection with the acquisition of property, assets or services, or (iii) for the payment of rent or other amounts relating to capitalized lease obligations; (b) any liability of others described in the preceding clause (a) which the Maker has guaranteed or which is otherwise its legal liability; and (c) any modification, renewal, extension, replacement or refunding of any such liability described in the preceding clauses (a) and (b).

**2.3     Rank; Future Subordinated Debt.** This Note will rank *pari passu* with all future subordinated debt of the Maker. The only debt of the Maker which may rank senior to the Note is debt which is Senior Debt of the Maker.

**2.4     Default.** Upon any default of the Maker in the payment of principal of or interest on Senior Debt, whether at maturity or otherwise, no payment may be made with respect to the principal of or interest on this Note or in respect of any redemption, retirement, purchase or other acquisition of this Note, unless and until such default has been cured or waived or has ceased. Upon any other default with respect to any Senior Debt permitting the holders thereof to accelerate the maturity thereof and upon written notice thereof given to the Maker, no payment may be made with respect to the principal of or interest on this Note or in respect of any redemption, retirement, purchase or other acquisition of this Note for a period terminating upon the cure, waiver or cessation of such default.

**2.5     Liquidation; Dissolution, Etc.** Upon any payment or distribution of the assets of the Maker to creditors upon any dissolution, total or partial liquidation or reorganization of or similar proceeding relating to the Maker, the holders of Senior Debt will be entitled to receive payment in full before the Holder is entitled to receive any payment.

**3      Representations and Warranties of the Maker.**

**3.1     Organization and Standing.** The Maker: **(i)** is a corporation duly organized, validly existing and in good standing under the laws of the State of New York; **(ii)** has all requisite power and authority and all necessary licenses and permits to own and operate its properties and to carry on its business as now conducted and as presently proposed to be conducted; and **(iii)** is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein the nature of the business transacted by it or the nature of the property owned or leased by it makes such licensing or qualification necessary.

**3.2     Authorization.** Maker has all requisite power and authority to execute, deliver and perform this Note and to carry out and consummate the transactions contemplated hereby. The execution, delivery and performance of this Note by Maker have been duly authorized by all requisite corporate action, and this Note has been duly executed and delivered by Maker and constitutes the valid and binding obligation of Maker, enforceable against Maker in accordance with its terms, subject as to enforcement of remedies to applicable bankruptcy, insolvency, reorganization or similar laws affecting generally the enforcement of creditors' rights and the relief of debtors.

**3.3     No Conflict with Law or Documents.** The execution, delivery and performance of this Note by Maker will not violate any provision of law, any rule or regulation of any governmental authority, or any judgment, decree or order of any court binding on Maker, and will not conflict with or result in any breach of any of the unwaived terms, conditions or provisions or constitute a default under, or result in the creation of any lien, security interest, charge or encumbrance upon any of the properties, assets or outstanding shares of Maker under its Certificate of Incorporation or By-Laws or any indenture, mortgage, lease, agreement or other instrument to which Maker is a party or by which it or any of its properties is bound or affected.

**3.4     Capital Stock.** The authorized capital stock of the Company consists of 250,000,000 shares of Common Stock, of which 18,436,250 shares have been duly and validly issued and are currently outstanding, fully paid and nonassessable and 1,000,000 shares of Preferred Stock, par value $0.01 per share, of which 32,644 shares of Preferred Stock have been duly and validly issued and are currently outstanding. There are no preemptive or similar rights to purchase or otherwise acquire any shares of any class of the Company's capital stock pursuant to any provision of law or the Articles of Incorporation or By-Laws of the Company or otherwise.

**3.5     Private Offering.** Neither Maker nor anyone acting on behalf of Maker has engaged in any general advertising or solicitation in contravention of Rule 5 02(c) under the Securities Act of 1933, as amended (the **"Securities Act"**) for the offer and sale of this Note. The offer, sale, issuance and delivery of this Note are exempt from registration under the Securities Act and all action required to be taken prior to the offer or sale of this Note has been taken under applicable state securities laws.

**3.6    Subsidiaries.** Maker has no subsidiaries and does not own any interest, directly or indirectly, in any other corporation.

**3.7    Compliance with Laws.** Maker is in compliance with all laws, ordinances, and rules and regulations of governmental authorities applicable to or affecting it, its properties or its business, and Maker has not received notice of any claimed violation or default with respect to any of the foregoing.

**3.8    Agreements Affecting Equity Securities.** Except as referenced in Section 3.4 and: (i) in this Note, (ii) pursuant to Common Stock purchase warrants that will be issued to the Lender in connection with the issuance of this Note; and (iii) pursuant to other subordinated notes of similar tenor to this Note that may be issued to investors and similar warrants, there are no agreements, arrangements or understandings, written or oral, relating to the issuance of any additional shares of capital stock.

**3.9    No Defaults.** Maker is not (i) in default under any material lease, employment contract, loan agreement, or other instrument, agreement or contract which must be disclosed hereunder to which Maker is a party or by which any of Maker's assets or properties are bound or affected, (ii) in violation of its Certificate of Incorporation or By-Laws or any applicable law or governmental regulation, or (iii) in default with respect to any order, writ, injunction or decree of any court or governmental agency binding on Maker and no event has occurred which with notice or lapse of time, or both, would create such a default or violation.

**3.10 Financial Statements.** The balance sheet of the Maker as of December 31, 2010 (unaudited) and the (unaudited) statements of income for the fiscal period then ended, have been prepared in accordance with generally accepted accounting principles, consistently applied except as therein noted, are correct and complete and present fairly the financial position of the Maker as of such dates and the results of its operations and cash flows for such periods.

**3.11 Litigation.** There are no proceedings pending or, to the knowledge of the Maker, threatened against or affecting the Maker in any court or before any governmental authority or arbitration board or tribunal which involve the possibility of materially and adversely affecting the properties, business, prospects, profits or condition (financial or otherwise) of the Maker. The Maker is not in default with respect to any order of any court or governmental authority or arbitration board or tribunal.

**3.12 Title.** The Maker has good and marketable title in fee simple (or its equivalent under applicable law) to all the real property and has good title to all the other property it purports to own, including that reflected in the most recent balance sheet referred to above except as sold or otherwise disposed of in the ordinary course of business and except for liens disclosed in notes to the financial statements referred to above.

**3.13 No Defaults.** No default or Event of Default as defined in Section 4 hereof has occurred and is continuing. The Maker is not in default in the payment of principal or interest on any indebtedness for borrowed money and is not in default under any instrument or instruments or agreements under and subject to which any indebtedness for borrowed money has been issued and no event has occurred and is continuing under the provision of any such instrument or agreement which with the lapse of time or the giving of notice, or both, would constitute an Event of Default hereunder.

4

**3.14 Consents, Approvals.** No approval, consent or withholding of objection on the part of any United States regulatory body, state, Federal or local, is necessary in connection with the execution and delivery by the Maker of this Note or the compliance by the Maker with any of the provisions of this Note.

**3.15 Taxes.** All tax returns required to be filed by the Maker in any jurisdiction have, in fact, been filed, and all taxes, assessments, fees and other governmental charges upon the Maker or upon any of its properties, income or franchises, which are shown to be due and payable in such returns have been paid. No material controversy in respect of additional income taxes due is pending or, to the knowledge of the Maker, threatened. The provisions for taxes on the books of the Maker are adequate for all open years, and for its current fiscal period.

### 4    Events of Default.

It shall be an Event of Default with respect to this Note upon the occurrence and continuation uncured of any of the following events:

#### 41    This Note.

(a)    a default in the payment of the principal on this Note, when and as the same shall become due and payable, either by the terms hereof or upon redemption or otherwise and said default continues uncured for a period of ten (10) days; or

(b)    payment is not made of one interest payment on this Note, and such default shall continue uncured for ten (10) days after the date fixed for the making of such interest payment; or

(c)    default in the performance, or breach, of any covenant of the Maker in this Note (other than a covenant or default which is elsewhere herein specifically dealt with as an Event of Default), and continuance of such default or breach uncured for a period of thirty (30) days; or

#### 42    Other Indebtedness. Default under any bond, debenture, note or other evidence of indebtedness for money borrowed by the Maker (including obligations under leases required to be capitalized on the balance sheet of the lessee under generally accepted accounting principles but not including any indebtedness or obligation for which recourse is limited to property purchased) or under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any indebtedness for money borrowed by the Maker (including such leases but not including such indebtedness or obligation for which recourse is limited to property purchased), whether such indebtedness now exists or shall hereafter be created, if the effect of such default is to cause such indebtedness to become or be declared due and payable prior to the date on which it would otherwise have become due and payable and such default results in an acceleration or a principal amount of such indebtedness which, together with the principal amount of such other indebtedness so accelerated, aggregates an outstanding amount exceeding $250,000 without such indebtedness being discharged or such acceleration being rescinded, cured or annulled within a period of ninety (90) days; or

**43     Entry of Judgment.** The entry of a decree or order by a court having jurisdiction adjudging the Maker a bankrupt or insolvent, or approving a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Maker, under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Maker or of any substantial part of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of ninety (90) days; or

**44     Voluntary Bankruptcy Petition.** The commencement by the Maker of a voluntary case under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency, or other similar law, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under federal bankruptcy law or any other applicable federal or state law, or the consent by it to the filing of such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or similar official of the Maker or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing if its inability to pay its debts generally as they become due, or the taking of corporate action by the Maker in furtherance of any such action; or

**4.5     Involuntary Bankruptcy Petition.** There shall be commenced against the Maker any proceeding relating to the Maker under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, receivership, dissolution, or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, and any such proceeding shall remain undismissed for a period of 30 days or the Maker by any act indicates its consent to, approval of, or acquiescence in, any such proceeding; or a receiver or trustee shall be appointed for the Maker or for all or a substantial part of the property of the Maker and any such receivership or trusteeship shall remain undischarged for a period of 30 days or a warrant of attachment, execution, or similar process shall be issued against any substantial part of the property of the Maker and the same shall not be dismissed or bonded within 30 days after levy; or

**46     Breach of Warranty.** If any representation or warranty made by the Maker herein is untrue in any material respect as of the date hereof, or

**4.7     Breach of Covenants.** The Maker shall (i) remain in material breach of any of the covenants and agreements contained in Section 5.1 and such breach shall remain uncured for ten (10) days after the Maker received written notice of same; or (ii) the Maker shall breach any of the covenants and agreements contained in Section 5.2, without any opportunity to cure, then, and in any such event, the holder of this Note may by written notice to the Maker declare the entire unpaid principal amount of the Note outstanding together with accrued interest thereon due and payable, and the same shall forthwith become due and payable without presentment, demand, protest, or other notice of any kind, all of which are expressly waived.

**5     Principal Obligation; Covenants.** No provision of this Note shall alter or impair the obligation of the Maker, which is absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective time, at the rates, and in the currency herein prescribed.

**5.1**     **Affirmative Covenants.** The Maker covenants and agrees that, while this Note is outstanding, it shall:

**5.1.1 Pay Taxes and Other Liabilities.** Pay and discharge, before the same become delinquent and before penalties accrue thereon, all material taxes, assessments and governmental charges upon or against it or any of its properties, and all its other material liabilities at any time existing, except to the extent and so long as: (i) the same are being contested in good faith and by appropriate proceedings in such manner as not to cause any materially adverse effect upon the financial condition of Maker and its subsidiaries taken as a whole or the loss of any right of redemption from any sale thereunder; and (ii) it shall have set aside on its books reserves segregated to the extent required by Generally Accepted Accounting Principles ("GAAP") and in amounts deemed adequate by GAAP; and pay all governmental charges or taxes at any time payable or ruled to be payable in respect of any existing or hereafter enacted federal or state statute, and indemnify and hold each Holder harmless against liability in connection with any such charges or taxes.

**5.1.2 Records and Reports.** Maintain a standard and modern system of accounting and present its financial statements in accordance with GAAP applied on a consistent basis; permit the representatives of the Holder, as long as it holds this Note or any securities acquired upon conversion of this Note, to have access to and to examine its or properties, books and records at all reasonable times.

**5.1.3 Access to Records.** Permit representatives of the holder of this Note to examine and make extracts from the financial books and records of the Maker during normal business hours;

**5.1.4 Maintain Corporate Rights and Facilities.** Maintain and preserve its corporate existence and all material rights, franchises and other authority necessary for the conduct of its business; maintain its properties, equipment and facilities in good order and repair and conduct its business in an orderly manner without voluntary interruption and continue in the same business as is presently conducted by the Maker.

**5.1.5 Notices of Defaults and Actions.** Promptly notify the holder of this Note of (i) the occurrence of any event of default under this Note, and (ii) any action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency which, if adversely determined, could materially impair the right of the Maker to carry on business substantially as presently conducted or could materially adversely affect its business, operations, properties, assets or condition, financial or otherwise, and (iii) any development in its business or affairs which may be materially adverse to the Maker, disclosing the nature thereof;

**5.1.6 Compliance with Laws.** Comply in all material respects with all statutes, laws, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations and requirements (**"Requirement(s)"**) of all governmental bodies, departments, commissions, boards, companies or associations insuring the premises, courts, authorities, officials, or officers, which are or may be applicable to the Maker or its properties; provided that nothing contained herein shall prevent the Maker from contesting the validity or the application of any Requirements;

**5.1.7 Financial Reports.** Furnish to the holder of this Note:

(i)       As soon as available and in any event within 120 days after the end of each fiscal year of the Maker, (A) a balance sheet of the Maker and its subsidiaries and (B) a statement of operations of the Maker and its subsidiaries and statements of cash flows and stockholders' equity of the Maker as of the close of such fiscal year, all of the foregoing financial statements with respect to the Maker to be certified by independent public accountants;

(ii)      As soon as available and in any event within 60 days after the end of each fiscal quarter of the Maker, a balance sheet and statements of operations, cash flows and stockholders' equity, showing the financial condition of the Maker and its subsidiaries.

**5.2**      **Negative Covenants.** The Maker covenants and agrees that while this Note is outstanding it will not directly or indirectly, without the written consent of the Required Holders (as defined below):

**5.2.1** purchase, redeem, retire or otherwise acquire, or set aside any assets or deposit any funds for the purchase, redemption, retirement or other acquisition of, any shares of any class or series of capital stock of the Maker or any securities convertible into, or exercisable or exchangeable for, any shares of any class or series of capital stock of the Maker;

**5.2.2** enter into any agreement, or adopt any resolution, or cause or permit any Subsidiary to enter into any agreement or adopt any resolution, in respect of (i) any merger of the Maker or such Subsidiary with or into any other corporation, partnership or other entity, (ii) any consolidation of the Maker or such Subsidiary with any other corporation, partnership or other entity, (iii) any transaction or series of related transactions in which the Maker shall sell or otherwise transfer all or substantially all of the Maker's business, property or assets or (iv) any dissolution, liquidation or reorganization of the Maker;

**5.2.3** incur Senior Debt; or

**5.2.4** amend or modify on behalf of the Maker the terms, provisions or conditions of this Note or extend the term of this Note.

"Required Holders" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding.

## 6     CONVERSION.

**6.1**      **Optional Conversion.** The outstanding principal balance of, plus accrued and unpaid interest on, this Note may, at the option of Lender, in its sole discretion, be converted into Common Stock, at any time, and from time to time, by Lender's surrender of this Note at the office of the Maker, accompanied by a written notice of conversion in the form annexed hereto duly executed by the Lender or its duly authorized attorney, at a conversion price of $0.88 per share, subject to adjustment as hereinafter provided (the **"Conversion Price"**). If this Note is converted in part only, the Maker will issue a new Note for the principal amount not so

converted. Interest shall accrue through and including the business day prior to the date of conversion and shall be credited towards the exercise of the conversion rights hereunder unless the Holder shall notify the Maker that accrued interest is to be paid in cash. No adjustments in respect of dividends will be made upon any conversion. No fractional shares or scrip representing fractional shares will be issued upon any conversion, but an adjustment in cash will be made, in respect of any fraction of a share which would otherwise be issuable upon the surrender of this Note for conversion.

**6.2      Dividends; Reclassifications, etc.** In the event that the Maker shall, at any time prior to the exercise of conversion rights hereunder: (i) declare or pay to the holders of the Common Stock a dividend payable in any kind of shares of capital stock of the Maker; or (ii) combine, subdivide or otherwise reclassify its Common Stock into the same or a different number of shares with or without par value, or in shares of any class or classes; or (iii) transfer its property as an entirety or substantially as an entirety to any other company; or (iv) make any distribution of its assets to holders of its Common Stock as a liquidation or partial liquidation dividend or by way of return of capital; then, in each case, each Conversion Price, and the number and kind of shares of Common Stock receivable upon conversion of this Note, in effect at the time of the record date for such dividend or distribution, or of the effective date of such subdivision, combination or reclassification, shall be proportionally adjusted so that the holder upon the subsequent exercise of conversion rights, shall receive, in addition to or in substitution for the shares of Common Stock to which it would otherwise be entitled upon such exercise, such additional shares of capital stock or scrip of the Maker, or such reclassified shares of capital stock of the Maker, or such shares of the securities or property of the Maker resulting from such transfer, or such assets of the Maker, which it would have been entitled to receive had it exercised these conversion rights prior to the happening of any of the foregoing events. Such adjustment shall be made successively whenever any of the foregoing events shall occur.

**6.3      Registration of Transfer or Conversion.** The Maker shall maintain books for the transfer and registration of Notes. Upon the transfer of any Note in accordance with the provisions of Section 7.2 hereof, the Maker shall issue and register the Note in the names of the new holders. The Notes shall be signed manually by the Chairman, Chief Executive Officer, President or any Vice President and the Secretary or Assistant Secretary of the Maker. The Maker shall convert, from time to time, any outstanding Notes (or part thereof) upon the books to be maintained by the Maker for such purpose upon surrender thereof for conversion properly endorsed or accompanied by appropriate instructions for conversion. Subject to the terms of this Note, upon surrender of this Note the Maker shall promptly issue and deliver to or upon the written order of the Lender of such Note and in such name or names as such Lender may designate, a certificate or certificates for the number of full shares of Common Stock due to such Lender upon the conversion of this Note (the "**Conversion Shares**"). Such certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the Lender of record of such Conversion Shares as of the date of the surrender of this Note; *provided, however,* that if, at the date of surrender the transfer books of the Common Stock shall be closed, the certificates for the Conversion Shares shall be issuable as of the next date on which such books shall be opened and until such date the Maker shall be under no duty to deliver any certificate for such Conversion Shares; *provided, further, however,* that such transfer books, unless otherwise required by law or by applicable rule of any national securities exchange, shall not be closed at any one time for a period longer than 20 days.

     **6.4**   **Notice to Lender.** If, at any time while this Note is outstanding, the Maker shall pay any dividend payable in cash or in Common Stock, shall offer to the holders of its Common Stock for subscription or purchase by them any shares of stock or any class or any other rights, or shall enter into an agreement to merge or consolidate with another corporation, the Maker shall cause notice thereof to be mailed to the registered holder of this Note at its address appearing on the registration books of the Maker, at least ten (10) days prior to the record date as of which holders of Common Stock shall participate in such dividend, distribution or subscription or other rights or at least ten (10) days prior to the effective date of the merger or consolidation. Failure to give notice as required by this Section, or any defect therein, shall not affect the legality or validity of any dividend, distribution or subscription or other right.

     **6.5**   **Adjustments to Conversion Price.** The Conversion Price in effect at the time of the exercise of conversion rights hereunder as set forth in Sections 7.1 and 7.2 shall be subject to adjustment from time to time as follows:

     ***6.5.1 Issuance of Common Stock or Convertible Securities.*** If at any time after the date of issuance hereof the Maker shall issue and sell any shares of Common Stock, or grant or issue any rights or options exercisable for the purchase of stock or other securities convertible into or exchangeable for Common Stock (such convertible stock or securities being herein collectively referred to as **"Convertible Securities"**) other than: (i) shares issued in a transaction described in Section 6.5.2; or (ii) shares issued, subdivided or combined in transactions described in Section 6.3 (provided that the Conversion Price shall have been previously adjusted pursuant thereto); for a consideration per share (the **"New Issuance Price"**) which is less than the Conversion Price in effect on the date of such issuance or sale (the **"Applicable Conversion Price"**), then the Applicable Conversion Price shall simultaneously with such issuance or sale, be adjusted to equal to the New Issuance Price.

     ***6.5.2 Exclusions.*** Anything in this Section 6.6 to the contrary notwithstanding, no adjustment in the Conversion Price shall be made in connection with the issuance of Common Stock and/or grant, issuance or exercise of any Convertible Securities:

     (i) issued pursuant to the Maker's current employee compensation plan;

     (ii) outstanding on the date of the issuance of this Note;

     (iii) that were issued contemporaneously with this Note or are issued after the date hereof but part of the same offering of subordinated convertible notes and warrants; or

     (iv) when such securities are issued in one or more offerings at a price per share less than the Conversion Price that results in no more than $500,000 of net proceeds in the aggregate to the Company.

     ***6.5.3 De Minimis Adjustments.*** Anything in this Section 6.6 to the contrary notwithstanding, no adjustment in the Conversion Price shall be required unless such adjustment would require an increase or decrease of at least five percent (5%) in such Conversion Price; *provided, however,* that any adjustments which by reason of this subsection 6.6.3 are not required to be made shall be carried forward and taken into account in making subsequent adjustments. All calculations under Section 6.6 shall be made to the nearest cent.

**6.5.4 *Notice of Adjustment.*** Upon any adjustment of the Conversion Price, then and in each such case the Maker shall promptly deliver a notice to the registered Lender of this Note, which notice shall state the Conversion Price resulting from such adjustment, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

**66      Assurances.** The Maker shall be under no obligation to effect such conversion into Common Stock until either it has received such assurances as it may require that the Common Stock to be so issued is being taken for investment and not for distribution or such issuance is exempt from registration under the Securities Act or a registration statement under the Securities Act with respect to such Common Stock has been declared effective.

### 7. TRANSFER TO COMPLY WITH THE SECURITIES ACT OF 1933.

**7.1**      The Holder of this Note, each transferee hereof and any Holder and transferee of any Conversion Shares, by his acceptance thereof, agrees that (i) no public distribution of Notes or Conversion Shares will be made in violation of the Securities Act, and (ii) during such period as the delivery of a prospectus with respect to the Conversion Shares may be required by the Securities Act, no public distribution of the Conversion Shares will be made in a manner or on terms different from those set forth in, or without delivery of, a prospectus then meeting the requirements of Section 10 of the Securities Act and in compliance with applicable state securities laws. The Holder of this Note and each transferee hereof further agrees that if any distribution of any Conversion Shares is proposed to be made by them otherwise than by delivery of a prospectus meeting the requirements of Section 10 of the Securities Act, such action shall be taken only after submission to the Maker of an opinion of counsel, reasonably satisfactory in form and substance to the Maker's counsel, to the effect that the proposed distribution will not be in violation of the Securities Act or of applicable state law. Furthermore, it shall be a condition to the transfer of this Note that any transferee thereof deliver to the Maker his written agreement to accept and be bound by all of the terms and conditions contained in this Note.

**7.2**      Neither this Note, the Conversion Shares, nor any other security issued or issuable upon conversion of this Note, may be sold or otherwise disposed of except as follows:

(1)      To a person who, in the opinion of counsel to the Maker, is a person to whom this Note or Conversion Shares may legally be transferred without registration and without the delivery of a current prospectus under the Securities Act with respect thereto and then only against receipt of an agreement of such person to comply with the provisions of this Subsection (1) with respect to any resale or other disposition of such securities which agreement shall be satisfactory in form and substance to the Maker and its counsel; provided that the foregoing shall not apply to any such Note, Conversion Shares or other security as to which such Holder shall have received an opinion letter from counsel to the Maker as to the exemption thereof from the registration under the Securities Act pursuant to Rule 144 under the Securities Act; or

(2)      To any person upon delivery of a prospectus then meeting the requirements of the Securities Act relating to such securities and the offering thereof for such sale or disposition.

      7.3     Each certificate for Conversion Shares issued upon conversion of this Note shall bear a legend relating to the non-registered status of such Conversion Shares under the Securities Act, unless at the time of conversion of this Note such Conversion Shares are subject to a currently effective registration statement under the Securities Act.

    **8**    **Costs.**

      **8.1**    **This Note.** Maker shall pay all attorneys' fees incurred by Lender in connection with the preparation of this Note.

      **8.2**    **Collection.** In case this Note should be placed in the hands of an attorney to institute legal proceedings to recover any amount due hereunder, or to protect the interests of the holder hereof, or in case the same should be placed in the hands of an attorney for collection, compromise, or other action, the Maker binds itself to pay all costs of collection and litigation together with the reasonable fees of the attorney who may be employed for that purpose. Written notice of Lender's intent to enforce this provision shall be mailed by certified mail to the Maker at the address above or at such other address as the Maker may designate to Lender in writing.

    **9.**    **Place of Execution and Venue of Legal Action.** This Note is being executed in the State of New York and shall constitute doing business in New York by the Maker. The venue of any legal action pursuant to this Note shall be in New York County, New York.

    **10.**    **Acceleration.** It is understood and agreed that upon the occurrence, after the expiration of a cure period of thirty (30) days with respect to nonmonetary defaults and fifteen (15) days with respect to monetary defaults, following the receipt by the Maker of written notice from the Lender, of a default in the payment of any installment of principal or interest, or any part thereof, when due, the Lender, at its election may accelerate the unpaid balance of the principal and all accrued interest due under this Note and declare the same payable at once without further notice or demand.

    **11.**    **Governing Law.**    All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.

**12.** **Waiver of Protest, Extensions and Renewals.** The Maker of this Note does hereby waive presentation of payment, notice of non-payment, protest, and notice of protest, and does hereby agree to all extensions and renewals of this Note, without notice.

**13.** **Waiver and Estoppel.** No delay or omission on the part of the Lender to exercise any right hereunder shall operate as a waiver of such right or any other right in this Note. A waiver on any one occasion shall not be construed as a bar to, waiver of or estoppel of any right or remedy on any future occasion.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, IntelliCell Biosciences, Inc. has caused this Note to be executed in its name by the signature of its Chief Executive Officer, as of the /7th day of December, 2011.

**INTELLICELL BIOSCIENCES, INC.**

By:_____
Name: Steven A. Victor
Title: Chief Executive Officer

- 14 -

## NOTICE OF CONVERSION

The undersigned hereby elects to convert principal under the 6% Subordinated Convertible Note due March 31, 2012 of Intellicell Biosciences, Inc., a Nevada corporation (the "Company"), into shares of common stock (the "Common Stock"), of the Company according to the conditions hereof, as of the date written below.  If shares of Common Stock are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as reasonably requested by the Company in accordance therewith.  No fee will be charged to the holder for any conversion, except for such transfer taxes, if any.


Date of Conversion:            _____


Conversion Price:              _____


Restricted     Common         _____
Stock To Be Delivered:


Signature:                     _____


Print Name:                    _____


Address:                       _____
                               _____
                               _____


Delivery Address:              _____
                               _____
                               _____